UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GEORGE J. VENDURA, JR.,     ) | |
| ) | |
| Plaintiff,     ) | |
| ) | |
| v.     ) | |
| ) | |
| NORTHROP GRUMMAN CORPORATION,     ) | |
| NORTHROP GRUMMAN AEROSPACE     ) | |
| SECTOR, NORTHROM GRUMMAN SPACE &     ) | |
| MISSION SYSTEMS CORP., NORTHROP     ) | CIVIL ACTION |
| GRUMMAN SPACE & MISSION SYSTEMS     ) | NO. 14-10943-WGY |
| CORP. SALARIED PENSION PLAN,     ) | |
| NORTHROP GRUMMAN SPACE & MISSION     ) | |
| SYSTEMS CORP. SALARIED PENSION     ) | |
| PLAN ADMINISTRATIVE COMMITTEE,     ) | |
| DENISE PEPPARD, TIFFANY     ) | |
| MCCONNELL, MICHAEL HARDESTY,     ) | |
| KEN BEDINGFIELD, and JONATHAN     ) | |
| BOXER,     ) | |
| ) | |
| Defendants.     ) | |
| ) | |

YOUNG, D.J.                                    October 16, 2015

## FINDINGS OF FACT, RULINGS OF LAW,
## AND ORDER FOR JUDGMENT

## I.    INTRODUCTION

George Vendura ("Vendura") began working for TRW Inc. ("TRW") in 1993.  He subsequently went on disability leave due to a work-related injury and never returned to work.  In 2002, Northrop Grumman Corporation ("Northrop") acquired TRW.  When Vendura formally retired in 2013, the Northrop Grumman Space & Mission Systems Corp. Salaried Pension Plan Administrative

Committee (the "Committee") – the group tasked with administering the Northrop Grumman Space & Mission Systems Corp. Salaried Pension Plan (the "Plan") – determined that Vendura ought receive credit for twelve years of so-called Benefit Service (that is to say, service for which he is eligible to receive benefits).  Following an internal appeal, Vendura has filed suit under the Employee Retirement Income Security Act ("ERISA") claiming that he is entitled to twenty years of Benefit Service.

Vendura initiated the present suit on March 18, 2014 when he filed a complaint against Northrop, Northrop Grumman Aerospace Sector, Northrop Grumman Space & Mission Systems Corp., the Plan, the Committee, Denise Peppard, Tiffany McConnell, Michael Hardesty, Ken Bedingfield, and Jonathan Boxer (collectively, the "Defendants").  Compl., ECF No. 1.

At a motion hearing held on September 19, 2014, the Court dismissed all of Vendura's claims except for Count I (raised under 29 U.S.C. § 1132(a)(1)(B)),[1] denied without prejudice a motion to transfer venue, and stated that the remainder of the case could be resolved, with the agreement of the parties, at a

---

[1] At oral argument, the Court indicated that all potential relief under ERISA in the matter would be considered under Count I, including equitable relief.  See Tr. 4:16-6:10, ECF No. 26.

case stated hearing.[2]   Elec. Clerk's Notes, ECF No. 25.

Following the case stated hearing for which both parties fully

briefed motions for judgment, the Court makes the following

findings of fact and rulings of law.

## II.  FINDINGS OF FACT

### A.  Relevant Terms of the Plan

The parties dispute which incarnation of the Plan governs

Vendura's claim for retirement benefits.[3]   Vendura argues that

the Defendants at various times cite to portions of plan

documents from the years 1997, 2006, and 2009 without firmly

establishing which version of the plan controls the disposition

of Vendura's claim.   E.g., Pl.'s Opp'n Defs.' Mot. J. ("Pl.'s

Opp'n") 2-3, ECF No. 52.   He claims that the 1997 version of the

Plan governs because during the processing of his retirement in

2013, the Defendants sent him a document indicating that the

---

[2] A case stated hearing is a procedure that allows the Court
to make a judgment based on the record in cases where there are
minimal factual disputes.   In its review of the record, the
Court is entitled to "'engage in a certain amount of
factfinding, including the drawing of inferences.'"   TLT Constr.
Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007)
(quoting United Paperworkers Int'l Union Local 14 v. Int'l Paper
Co., 64 F.3d 28, 31 (1st Cir. 1995)).

[3] The Court resolves this dispute in its findings of fact
because (1) the legal issues involved are very straightforward
and (2) outlining the contours of the Plan here facilitates both
the explanation of Vendura's claim under the Plan and the
ultimate legal analysis that appears below.

1997 version was the relevant one.  Mem. Supp. Pl.'s Mot. J.
Case Stated ("Pl.'s Mem.") 4, ECF No. 47.  The Defendants claim
that they mistakenly sent him this document and subsequently
notified Vendura that a different "retirement kit" applied to
his claim.  See Defs.' Br. Supp. Mot. J. ("Defs.' Mem.") 4, ECF
No. 50 (citing Administrative R. Case Stated Hr. ("Admin. R.")
NG000393, ECF No. 41[4]).  They offer two additional reasons why
Vendura cannot cite the 1997 document as the controlling version
of the Plan: first, they note that he never claimed that the
1997 document controlled during the internal appeals of his
claim and thus waived this argument (indeed, Vendura himself
stated during these appeals that the governing documents came
from 1999 and 2006), and second, they state that Vendura has
failed to provide any evidence that the Defendants represented
to him that the 1997 version controlled.  Defs.' Resp. Pl.'s Br.
Supp. Mot. J. ("Defs.' Opp'n") 7-8, ECF No. 54; Defs.' Reply Br.
Supp. Mot. J. ("Defs.' Reply") 3, ECF No. 60.  The Court finds
these arguments credible and persuasive, and therefore rejects
Vendura's argument that the 1997 version of the Plan controls
the disposition of this case.

---

[4] This record was filed under seal and does not appear in
electronic form on the docket; a hard copy was delivered to the
Court.  This opinion will refer to the Bates stamp numbers of
the record.

At the time Vendura began seeking benefits in 2012, the most recent version of the Plan consisted of amendments and related documents that took effect in 2009.  In relevant part, those documents read as follows:

Section 2.03 – <u>Part A Benefit</u>.

. . .

(d) <u>TRW Predecessor Plan Document</u>.  The TRW Predecessor Plan document describes the formula for determining the Part A Benefit for TRW Participants.

. . .

Section 16.01 – <u>Administrative Committee; Application for Benefits</u>.

(a) <u>Administrative Committee</u>.  The Administrative Committee or its delegate shall have full and sole discretionary authority to interpret all plan documents and to make all interpretive and factual determinations as to whether any individual is entitled to receive any benefit and the amount of such benefit under the terms of the Plan. . . . Any interpretation, determination, or other action of the Administrative Committee or its delegate shall be subject to review only if it is arbitrary or capricious or otherwise an abuse of discretion.

Decl. Liza Tiglao-Smith Supp. Defs.' Mot. Dismiss ("Tiglao-Smith Decl."), Ex. A, Northrop Grumman Space & Mission Sys. Corp. Salaried Pension Plan ("2009 Plan") G-5, 85, ECF No. 13-2.[5]

---

[5] Vendura attacks the Defendants' use of the 2009 version of the Plan by noting that the document does not appear at all in the administrative record of the case.  Pl.'s Opp'n 3.  This argument does not affect the Court's analysis for two reasons.

As far as Section 2.03 is concerned, the 2009 version of the Plan relies on the 1999 and 2006 versions of the Plan to define Vendura's substantive rights – and it is beyond dispute

While Section 2.03 appears somewhat opaque, the Defendants say
that it refers to the 1999 version of the Plan to define how
Vendura accumulates Benefit Service.  See Defs.' Mem. 8 n.6
(citing Admin. R. NG000029-238).  In their reply memorandum, the
Defendants clarify that the 2006 version of the Plan also states
that (given the date when Vendura went on disability leave) the
1999 version of the Plan governs.  Defs.' Reply 2-3 (citing
Admin. R. NG000328).  In pertinent part, the 1999 version of the
Plan reads as follows:

---

that these versions of the Plan do appear in the record.  See
Admin. R. NG000034-238, 000254-377.  Accordingly, the fact that
the 2009 version of the Plan is not in the record has no bearing
whatsoever on the determination of what benefits Vendura ought
receive.
     Section 16.01, meanwhile, is a procedural provision
discussing the degree of discretion vested in the Committee.
Procedural issues of this sort ought be governed by the version
of the Plan in place at the time the Committee evaluated
Vendura's claim.  Smathers v. Multi-Tool, Inc./Multi-Plastics,
Inc. Emp. Health & Welfare Plan, 298 F.3d 191, 196 (3d Cir.
2002); see also Tetreault v. Reliance Standard Life Ins. Co.,
769 F.3d 49, 57 n.5 (1st Cir. 2014) (taking note of the holding
in Smathers without deciding the issue due to waiver).  Because
Vendura filed his claim in 2012, the 2009 version of the Plan
thus controls.  Even if the absence of the 2009 version of the
Plan from the administrative record changed the applicability of
this rule, it would not affect the Court's analysis because
functionally identical language (the effect of which is
discussed below) appears in the record as part of the 2006
version of the Plan.  See Admin. R. NG000300 (stating in Section
6.09 that the Committee has "full discretionary authority to . .
. [c]onstrue and interpret the terms of the Plan, including the
power . . . to determine the facts underlying any claim for
benefits").

<u>1.1 – Definitions</u>

(ll) "<u>Severance from Service Date</u>" means the last day of the month in which the earlier of the following occurs:

 (i) the date a Participant ceases to be employed by the Controlled Group, whether due to quitting, retirement, discharge, or death; or

 (ii) the later of:

  (A) the twelve-month anniversary of his first day of absence from the Controlled Group for any reason other than that in (i) above, or
  (B) the date he ceases to accrue Service under Article II of the Plan.

<u>2.2 – Years of Benefit Service</u>

Except as otherwise provided in any applicable Schedule or Appendix, the Years of Benefit Service of a Participant, which shall be measured from the Participant's Employment Commencement Date to his Severance from Service Date, shall be equal to the sum of . . . any calendar month in which any of the following events occur while a given Employee is a Participant:

(a) receipt of compensation from the Controlled Group for the performance of services;

(b) absence without pay from work because of injury or occupational disease received in the course of his employment with the Controlled Group and for which he receives Workers' Compensation disability benefits; provided, however, that service credit shall be limited to a maximum of twelve months unless the Participant has met the eligibility requirements for receiving long term disability benefits (whether or not he actually receives such benefits);

. . .

(c) absence without pay from work due to a disability and for which he is entitled to receive long-term disability benefits under any plan maintained by a member of the Controlled Group, provided, however, with respect to an absence of work beginning on or after January 1, 2000 as a result of disability, . . . no more than sixty months of Benefit Service will be credited under this Section 2.2(c) for a Participant with five or more years of Vesting Service . . . .

Admin. R. NG000046-47; id. at NG000049, 000206 (reflecting original 1997 wording for Sections 2.2(a) and (b), plus the 1999 amended wording of Section 2.2(c)).  The 2006 version of the Plan also includes language that is identical to this 1999 wording in all respects relevant to Vendura's claim.  Compare id. at NG000046-47, 000049, 00206, with id. at NG000270-71, NG000273 (including identical language in Section 2.02 of the 2006 version of the Plan).  Indeed, Vendura himself acknowledged during his administrative appeal that the 1999 and 2006 versions of Article 2 were "essentially identical."  Id. at NG000711-12. Because the Committee referred primarily to the 2006 version of the Plan in rendering its decision, this opinion will do the same for the sake of consistency.

   B.   **Vendura's Employment and the Committee's Decision**

   Vendura began working for TRW and became a participant in the Plan in 1993.  Pl.'s Statement Material Facts Not in Dispute ("Pl.'s Facts") ¶ 1, ECF No. 48; Statement Undisputed Facts ("Defs.' Facts") ¶ 1, ECF No. 51.  Sometime in the 1990s, Vendura suffered a work-related injury, leading him to go on

medical leave starting June 10, 2000, after approximately seven
years of active employment for TRW.  See Pl.'s Facts ¶¶ 2-3;
Defs.' Facts ¶ 1.  During this leave, Vendura received Social
Security and long term disability benefits.  Pl.'s Facts ¶ 3;
Defs.' Facts ¶ 2.  The parties agree that Vendura applied for
workers' compensation benefits, but they dispute whether he
actually received these benefits during this time.  See Pl.'s
Facts ¶ 3; Defs.' Facts ¶ 2.

In 2002, Northrop acquired TRW - renaming the company
Northrup Grumman Space & Mission Systems Corp. ("NGSMSC") - and
assumed sponsorship of the Plan.  Defs.' Facts ¶ 3.  Northrop
attempted to lay Vendura off in 2003; after Vendura challenged
this termination, the parties entered into a Settlement
Agreement and General Release (the "Settlement Agreement").  See
Pl.'s Facts ¶¶ 4-5; Defs.' Facts ¶ 4.  The Settlement Agreement
includes several terms that the parties cite to in the present
dispute:

> 1.   Separation from Employment:  Vendura and NGSMSC
> agree that his employment with NGSMSC will terminate
> upon any of the following events, whichever occurs
> first: (1) Vendura's [long term disability] status
> ends or he is medically released to return to work; or
> (2) [NGSMSC's long term disability insurer] denies
> Vendura additional [long term disability] benefits,
> and his right to appeal said denial has either been
> exhausted or has expired; or (3) Vendura retires from
> NGSMSC; or (4) Vendura resigns from NGSMSC; or (5)
> Vendura dies; or (6) NGSMSC divests the business unit
> in which Vendura was employed. . . . Vendura
> acknowledges that as a result of this Agreement his

active employment with NGSMSC will be finally and
forever terminated and, once ended, will not be
resumed for any purpose.

. . .

3.   <u>Benefits and Patent Awards:</u>  Vendura shall
receive all benefits and rights to which he is
entitled pursuant to all benefit plans for which he is
eligible.  Such vesting and all other rights accorded
to Ventura shall be governed by the terms of all
applicable benefits plans and applicable law;
provided, however, that if there is a conflict between
the provisions of an applicable benefit plan and the
express language of this Agreement, then the express
language of this Agreement shall govern.  NGSMSC
reserves the right to prospectively change or modify
its benefit plans at any time and agrees that any such
changes will be applied to Vendura in a
nondiscriminatory manner.

Admin. R. NG001050-51; <u>see also</u> Defs.' Facts ¶¶ 5-7.

In May 2008, a Northrop human resources representative

wrote to Vendura to tell him that his employment would be

terminated because he had stopped accruing Benefit Service.

Defs.' Facts ¶ 8.  Vendura replied that this termination was

forbidden by the Settlement Agreement.  Admin. R. NG000438.

After conferring with legal counsel, the Northrop human

resources representative wrote back to Vendura and stated that

"our legal counsel has confirmed that you do not have to retire

by October 1, 2008.  You will remain [an] active employee on

long term disability . . . due to your settlement agreement

dated 7/11/2003."  <u>Id.</u> at NG000441; <u>see also</u> Pl.'s Facts ¶ 33;

Defs.' Facts ¶ 9.  Vendura also repeatedly sought confirmation

from Northrop that he was continuing to accrue Benefit Service and that he could elect a lump sum distribution of his pension, but the record does not show that anyone at Northrop ever sent this confirmation.  Defs.' Facts ¶¶ 10-11.

In October 2012, Vendura received notice that his long term disability benefits would be exhausted on February 28, 2013, thus triggering one of the conditions in his Settlement Agreement for his termination.  Defs.' Facts ¶ 12.  Shortly thereafter, Vendura reached out to Northrop to learn how to apply for his pension.  Id.  Northrop initially sent Vendura a retirement kit stating that he was able to elect a lump sum payment, but after realizing that the packet was sent in error, Northrop sent Vendura another retirement kit on April 22, 2013 that omitted the lump sum option.  Defs.' Facts ¶ 13; see also Admin. R. NG000393.

After viewing the benefit calculations included in both retirement kits, Vendura challenged Northrop's calculations and filed claims demanding (inter alia) twenty years of Benefit Service and the ability to elect a lump sum distribution.  Pl.'s Facts ¶ 14; Defs.' Facts ¶¶ 14-15.  Vendura claimed that he was due twenty years of Benefit Service because he had received worker's compensation benefits until 2013.  Defs.' Facts ¶ 17. He also requested copies of the Plan and the Summary Plan Description ("SPD").  Pl.'s Facts ¶ 36; Defs.' Facts ¶ 15.

Northrop sent him the 2001 version of the SPD and the 1997, 2002, and 2009 versions of the Plan on May 2, 2013; approximately two weeks later, it sent the 1999 version of the Plan as well.  Defs.' Facts ¶¶ 15-16.  The portions of the Plan relevant to this case are excerpted above.  The pertinent portions of the SPD read as follows:

> **Benefit Service**
> Benefit service is used to determine the amount of your pension benefit and your eligibility for early retirement benefits.
>
> One full month of benefit service is credited for the following:
>
> . . .
>
> For any period of absence from work due to disability beginning before January 1, 2000, any months in which you are eligible to receive TRW long-term disability benefits;
>
> For any period of absence from work due to disability beginning on or after January 1, 2000, no more than 12 months of benefit service will be credited for any period of disability unless you have five years of vesting service at the time your disability commenced, in which event, you will be credited with service for any month in which you are eligible to receive TRW long-term disability benefits up to 60 months.

Tiglao-Smith Decl., Ex. D, Summary Plan Description ("SPD") 4-5, ECF No. 13-5.

On June 13, 2013, the Committee responded to Vendura's claim letters.  Defs.' Facts ¶ 18; Admin. R. NG000243-51.  The Committee rejected Vendura's claim that he was entitled to twenty years of Benefit Service, stating that he was entitled to

[12]

twelve years.  Admin. R. NG000245.  The Committee based this decision on Section 2.02(c) of the 2006 version of the Plan, which creates a sixty-month cap on the amount of Benefit Service a Participant can receive for long term disability leave beginning after January 1, 2000.  Id.  Because Vendura had started his leave in June 2000 and had been on leave for more than five years, this five-year maximum was added to his seven years of actual service to make up twelve years of Benefit Service.  Id.  The Plan Administrator further stated that the Settlement Agreement was irrelevant to this decision, as "[t]he Settlement Agreement does not address the Plan's rule that no more than 60 months of benefit service may be credited for unpaid disability leaves of absence beginning on or after January 1, 2000."  Id. at NG000246.  Regarding Vendura's claim that he should be allowed to elect a lump sum distribution, the Plan Administrator stated that "[t]he Plan has consistently been administered so that a participant who ceases accruing [benefit] service is no longer eligible to make a lump sum election."  Id. at NG000248.  Because Vendura had stopped accruing Benefit Service when he hit the sixty-month cap for benefit-eligible disability leave in 2005, the Committee decided that he was no longer able to elect a lump sum payment.  Id.

Following an internal appeal, the Committee issued a final decision rejecting Vendura's claims in a letter dated December

[13]

19, 2013.  Pl.'s Facts ¶ 24, Defs.' Facts ¶ 20; Admin. R. NG000392-400.  In the letter, the Committee essentially reiterated its earlier statements that Section 2.02(c) of the 2006 version of the Plan caps Vendura's Benefit Service accrued during disability leave at sixty months and that Vendura was not able to elect a lump sum payment.  Admin. R. NG000396, NG000398-99.  The Committee also expanded on its earlier statement that the Settlement Agreement and its provisions regarding Vendura's employment status were irrelevant to its determination, noting that the Plan awards Benefit Service "based on the type and duration of a participant's leave (rather than based on 'active employment' status)."  Id. at NG000396-97.

The Committee also rejected an argument Vendura advanced regarding Section 2.02(b).  This section states that Benefit Service accrual during leave for which worker's compensation is granted is capped at twelve months unless the Plan participant is eligible for long term disability benefits; Vendura argued that because he was eligible for long term disability benefits, the cap could not apply and thus he could receive Benefit Service credit for the full twenty years he requested.  See id. at NG000397.  The Committee stated that this exception to the Section 2.02(b) cap for those eligible for long term disability "was not intended to create a loophole under which benefit service in excess of 60 months could be credited," as the Plan

had historically been administered such that "[w]hen a participant received workers' compensation and long-term disability benefits concurrently, his benefit service was always based on the period during which he received long-term disability benefits" – that is to say, he was subject to the sixty-month cap of Section 2.02(c).  Id.

## III. RULINGS OF LAW

### A.   Deference Due to the Committee

As a threshold matter, the Court must decide what level of deference to grant to the Committee's decision to deny Vendura's claims.  If a plan administrator (like the Committee in this case) is vested with discretion to interpret the Plan and to determine an applicant's eligibility for benefits, its decision "must be upheld unless it is arbitrary, capricious, or an abuse of discretion."  Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (internal quotation marks omitted).  No "magic words" are necessary to trigger this standard; instead, the clear language of the Plan must convey to participants that such discretion exists.  See Brigham v. Sun Life of Canada, 317 F.3d 72, 81 (1st Cir. 2003).  The Defendants argue that the language in the 2009 version of the Plan granting the Committee "full and sole discretionary authority to interpret all plan documents and to make all interpretive and factual determinations as to whether any individual is entitled to

receive any benefit" clearly conveys such discretion, thereby triggering the arbitrary and capricious standard of review. Defs.' Mem. 6-7.

Vendura offers two arguments as to why the Court ought instead apply a de novo standard of review.  First, he seems to argue that the Committee itself did not render the decision rejecting his claim and instead delegated that authority to some other party; because the Defendants did not adequately demonstrate that they had followed the proper procedures for delegation, he says, they are not entitled to arbitrary and capricious review.  See Pl.'s Mem. 7-8.  The Court rejects this argument out of hand.  As the Defendants rightly point out, the letter alerting Vendura to the final rejection of his claim made clear that the Committee had decided the issue, Admin. R. NG000392 ("[T]he Committee must deny your appeals for the reasons described below."), and thus there was no delegation of the discretion vested in it by the Plan.

Vendura's second argument hinges on the relationship between the Plan and the Settlement Agreement.  "Where the administrator's determination of eligibility depends upon an interpretation of non-plan documents . . . [the court's] review is . . . de novo."  See Pl.'s Mem. 8 (citing Coffin v. Bowater Inc., 501 F.3d 80, 85 (1st Cir. 2007)).  He contends that the Committee's decision relied entirely on its reading of the

Settlement Agreement – a non-Plan document that by its own terms prevailed when its express terms conflicted with the Plan – and thus that the Committee's decision ought not be granted deference.  Pl.'s Mem. 8-9.

The Defendants offer two arguments against Vendura's position.  First, they note that he far overstates the role of the Settlement Agreement in the Committee's final decision – indeed, rather than interpreting and relying on the Settlement Agreement, the Committee determined that the Settlement Agreement did not conflict with and did not alter the Committee's interpretation of the Plan's own language.  Defs.' Opp'n 6 (citing Admin. R. NG000396).  Second, they contend that even if the Committee relied on its interpretation of the Settlement Agreement, "de novo review would only be appropriate with respect to its interpretation of [the Settlement Agreement]."  Id. (citing Hannington v. Sun Life & Health Ins. Co., 711 F.3d 226, 230 (1st Cir. 2013) ("[W]hen the plan fiduciary is required, in the course of determining the meaning of the plan language, to interpret material outside the plan, our review of the extra-plan material is de novo." (emphasis added))).

In his reply, Vendura attempts to rebut each of these points.  First, he claims that "it is impossible . . . not [to]

recognize the central role that interpretation of the Settlement
Agreement plays in this dispute over [his] pension benefits."
Pl.'s Reply Defs.' Opp'n ("Pl.'s Reply") 2, ECF No. 59.  Second,
he claims that the Defendants misread First Circuit precedent,
as the case they cite applies de novo review to the plan
administrator's entire decision rather than just to the
documents outside the Plan.  Id. at 2-4 (citing Hannington, 711
F.3d at 230-32).

The Court agrees with the Defendants and thus applies
arbitrary and capricious review to the Committee's
interpretation of the terms of the Plan.  The Defendants offer
the more accurate portrayal of the role the Settlement Agreement
played in the Committee's decision: while Vendura is correct
that the Settlement Agreement contains provisions guaranteeing
his employment status, see Admin. R. NG001050, the Committee
properly noted in its final letter that the question of
employment status is distinct from the question of when an
employee accrues Benefit Service under the terms of the Plan
itself, see id. at NR000396-97.[6]  It would be quite a stretch for
the Court to hold that the Committee relied on any sort of
interpretation of the Settlement Agreement to shape its

---

[6] The opinion will expand more on this issue in the
substantive section on the language of the Plan, as this
distinction is a core part of the interpretation upon which the
Committee relied.

interpretation of the Plan.  The Court will review the Committee's interpretation using the deferential arbitrary and capricious standard.

**B.  Accrual of Benefit Service**

The core dispute in this case is whether the Committee properly assessed the amount of Benefit Service Vendura had accrued.  Because ERISA stresses that the terms of the Plan control, see 29 U.S.C. § 1132(a)(1)(B) (stating that civil actions may be brought to enforce various rights "under the terms of [a plaintiff's] plan"); see also Coffin, 501 F.3d at 96 (analyzing "the plain language of the disputed provision and putting aside . . . the technical arguments of the parties"), this opinion will focus first on the express language of the Plan before turning to extrinsic considerations.

**1.  Language of the Plan**

**a.  Vendura's Arguments**

Vendura focuses his arguments on two parts of Article 2 of the 2006 version of the Plan, which in relevant part defines when a participant may accrue Benefit Service.  First, he focuses on the portion of Section 2.02 stating that "[y]ears of Benefit Service of a Participant . . . shall be measured from the Participant's Employment Commencement Date to his Severance from Service Date."  Pl.'s Mem. 12; Admin R. NG000273.  He argues that because the Plan defines "Severance from Service

Date" as "the date a participant ceases to be employed by the Controlled Group, whether due to quitting, retirement, discharge, or death," Section 2.02 means he accumulated benefit service until his severance from service in the form of his retirement date – that is to say, that he accumulated twenty years of service between his hiring in 1993 and his formal retirement in 2013.   Id.

Second, Vendura focuses on paragraph (b) of Section 2.02, which states that Benefit Service is accumulated when a Participant has:

> [An] absence without pay from work because of injury or occupational disease received in the course of his employment with the Controlled Group and for which he receives Workers' Compensation disability benefits; provided, however, that service credit shall be limited to a maximum of 12 months unless the Participant has met the eligibility requirements for receiving long term disability benefits (whether or not he actually receives such benefits).

Admin. R. NG000273.  Vendura claims that he was injured in the course of his work and that he received workers' compensation – but because he was indisputably eligible for long term disability benefits, "the accrual of service time by this subparagraph is not subject to a temporal restriction."  Pl.'s Mem. 13.  Put differently, he argues that a Participant such as himself who receives workers' compensation and is also eligible for long term disability benefits may accrue Benefit Service indefinitely under this provision, as the twelve-month cap of

Section 2.02(b) does not apply under those circumstances. Because there is no temporal restriction on accumulation of Benefit Service under this provision, he says, he ought receive Benefit Service credit for the entirety of the twenty years between 1993 and 2013.  Id. at 14.[7]

### b.   Defendants' Arguments

The Defendants begin their argument by focusing on the portion of Section 2.02 stating that "the Years of Benefit Service of a Participant, which shall be measured from the Participant's Employment Commencement Date to his Severance from Service Date, shall be equal to the sum of . . . any calendar month in which" one of seven events occurs.  Admin. R. NG000273. In contrast to Vendura's suggestion that the language about the Employment Commencement Date and Severance from Service Date grants Benefit Service, the Defendants argue that this wording instead "establish[es] the range of months within which a participant may accrue Benefit Service under Subparts (a)-(g)."

---

[7] The complaint also alleges that Vendura received "compensation for the performance of services" for the entire twenty-year period between 1993 and 2013, Compl. ¶ 29, thus entitling him to twenty years of Benefit Service under Section 2.02(a), but he addresses this argument nowhere in his motion for judgment briefing, see Pl.'s Mem.  The Court may thus consider the argument waived.  Even if Vendura had not waived it, the record is clear that Vendura performed no services for Northrop after 2000, thus vitiating any argument that Section 2.02(a) entitles him to more than seven years of Benefit Service credit.

Defs.' Mem. 11.  This is a more common-sense reading of the Plan, they say, because Vendura's proposed reading would "render the majority of Section 2.02 obsolete" (since there would be no reason to lay out the events contemplated by subparts (a) through (g) if Participants received credit for the entire period between their hiring and severance from service).  Id.[8]

Turning to the subparts of Section 2.02, the Defendants offer a reading of subparts (b) and (c) that cap at five years the amount of Benefit Service Vendura may receive for his time on disability leave.  They argue that subpart (b)'s exception to the twelve-month cap on Benefit Service for Participants eligible for long term disability benefits does not allow for indefinite accrual of Benefit Service, as Vendura claims – rather, subparts (b) and (c) together create a system in which a Participant may obtain up to twelve months of credit during an absence from work if he receives workers' compensation but may obtain up to sixty months of credit if he is eligible for long

---

[8] The Defendants also note that (per the Plan's definition section) the Severance from Service Date may occur earlier than a Participant's retirement date if he stops accruing Benefit Service; because Vendura stopped accumulating Benefit Service in 2005, he is wrong to argue that his Severance from Service Date coincided with his retirement in 2013.  Defs.' Mem. 12-13 (quoting Admin. R. NG000047).  This argument necessarily relies on the Court already agreeing with the remainder of the Defendants' argument that Vendura stopped accumulating Benefit Service in 2005, however, and thus cannot serve as an independent ground upon which to find for the Defendants.

term disability in addition to workers' compensation.  <u>See</u>
Defs.' Mem. 15-16; Defs.' Opp'n 11.  They argue that this view
of the Plan is bolstered by the SPD, which states that Benefit
Service credit is capped at twelve months for those receiving
workers' compensation and sixty months for those receiving long
term disability benefits.  Defs.' Mem. 16; Defs.' Opp'n 11.

### c.  Court's Construction of the Plan

The Court rules that the Defendants have adequately shown
that the Committee's interpretation of the plan was not
arbitrary and capricious.  Vendura's proposed reading of the
text views various parts of Section 2.02 in isolation in a way
that makes little sense when the provision is viewed as a whole.
His interpretation of the term dealing with the Severance from
Service Date, for instance, would render meaningless the seven
subparts of Section 2.02 defining events that may grant Benefit
Service credit.  Similarly, his reading of subpart (b) as
granting unlimited credit to Participants receiving workers'
compensation and eligible for long term disability completely
ignores subpart (c), which explicitly caps at sixty months the
amount of credit that any participant eligible for disability
leave (whether receiving workers' compensation or not) may
receive.  It would be absurd to read the Plan in such a way that
two adjacent provisions essentially say the opposite thing
(i.e., one saying that Participants on long term disability have

a cap on their Benefit Service while the other says that no such
cap exists).

The Defendants' reading harmonizes all of the disputed
parts of Section 2.02.  Reading the term regarding the Severance
from Service Date as merely setting the outer bounds of the
period during which Benefit Service may be accumulated allows
subparts (a) through (g) to carry some additional meaning.
Similarly, the Defendants' view of subparts (b) and (c) – that
(b) caps the credit given to workers' compensation recipients at
twelve months, which under (c) can be bumped up to sixty months
if the Participant is eligible for long term disability – allows
both subparts to have independent weight without conflicting.

Moreover, adopting the Defendants' reading allows the Court
to sidestep several of the parties' additional conflicts over
the relevant terms.  The parties dispute, for example, the
factual question of whether Vendura ever actually received
workers' compensation benefits, as would be necessary for him to
receive Benefit Service credit under either party's
interpretation of Section 2.02(b).  See Defs.' Opp'n 12; Pl.'s
Opp'n 8-9.  The Court's construction of the Plan renders this
dispute irrelevant: under the Court's reading, subpart (b)
functionally funnels any credit given to those eligible for long
term disability through subpart (c).  It does not matter whether
Vendura met the requirements for credit under subpart (b) or

not.  Similarly, Vendura attacks the Committee's appeal to the
historical administration of the Plan as justifying its reading
of subparts (b) and (c).  Pl.'s Mem. 14.  By holding that the
text of the Plan itself supports the Committee's reading, the
Court obviates the need to evaluate the propriety of relying on
atextual historical practice to make pension benefit decisions.

Ultimately, then, the Court rules that the Committee was
reasonable in interpreting the Plan such that Vendura received
credit for seven years of Benefit Service under Section 2.02(a)
for the time he worked before going on leave, plus an additional
five years under Section 2.02(c) for the time he spent on
disability leave.

### 2.   Considerations Extrinsic to the Plan

In addition to his arguments regarding the language of the
Plan itself, Vendura offers several other arguments as to why he
should be credited with twenty years of Benefit Service.  For
the following reasons, the Court rejects these arguments.

### a.   The Settlement Agreement

Vendura argues that the terms of the Settlement Agreement
mean that he is due twenty years of Benefit Service.  Noting
that (by its own language) the express terms of the Settlement
Agreement supersede the Plan when any conflicts between the
documents arise, he claims that the Settlement Agreement's
guarantee of continued status as an employee (except in

circumstances that indisputably did not arise until 2013) means that – regardless of the language of the Plan – he "was an employee for purposes of determining his years of benefit service for over twenty years."  Pl.'s Mem. 16.[9]

In response, the Defendants stress the term of the Settlement Agreement stating that Vendura "shall receive all benefits and rights to which he is entitled pursuant to all benefit plans for which he is eligible"; they claim that this language shows that "[t]he Settlement Agreement does not in any way expand [Vendura's] rights under any employee benefit plans." Defs.' Mem. 13.  Bolstering this, they cite language from the Settlement Agreement that explicitly grants Benefit Service for the time Vendura spent on medical leave during his active employment but omits any mention of his disability leave that began in 2000, suggesting that the Settlement Agreement was not intended to grant Benefit Service credit beyond the date Vendura went on this permanent leave.  Id. (citing Admin. R. NG000151). Lastly, they note that the Settlement Agreement's terms governing Vendura's employment status bear only on the question

---

[9] At several points in his briefing, Vendura claims that the Settlement Agreement guaranteed that he would remain an "active employee" of Northrop.  E.g., Pl.'s Opp'n 12.  This is contrary, however, to the explicit language of the Settlement Agreement, which states that "Vendura acknowledges that as a result of this Agreement his active employment with NGSMSC will be finally and forever terminated and, once ended, will not be resumed for any purpose."  Admin. R. NG001050-51.

of his Severance from Service Date, which merely sets the
outside bounds of the period during which Benefit Service may be
accrued (rather than granting Benefit Service in and of itself).
Id. at 13-14.

The Court agrees with the Defendants on this issue.  No
explicit terms of the Settlement Agreement grant Vendura any
Benefit Service for time spent on disability leave, and its
guarantee of continued employee status until retirement does not
on its own give Vendura any right to Benefit Service credit
during this period (per the construction of Article 2.02 above).
Vendura's arguments on this issue thus rest on a misreading of
the Settlement Agreement and the Plan itself.  Accordingly, even
reviewing the terms of the Settlement Agreement de novo, the
Court rules that the Settlement Agreement does nothing to alter
its construction of the Plan (and the resulting decision that
Vendura is entitled only to twelve years of Benefit Service).

### b.   The Summary Plan Description

Vendura also argues that the SPD compels a ruling that he
is entitled to twenty years of Benefit Service.  Pl.'s Mem. 4;
Pl.'s Opp'n 15.  Specifically, he points to the portion of the
SPD stating that "[f]or any period of absence from work due to
disability beginning before January 1, 2000," credit is given
for "any months in which you are eligible to receive TRW long-
term disability benefits."  SPD 5.  He claims that because the

Defendants represented that the SPD applied to his case and because his disability began before January 1, 2000, he ought be entitled to credit for the entire thirteen-year period during which he received long term disability benefits.  Pl.'s Mem. 4.

In response, the Defendants note that the very next line of the SPD states that "[f]or any period of absence from work due to disability beginning on or after January 1, 2000, . . . [a participant] will be credited with service for any month in which [he is] eligible to receive TRW long-term disability benefits up to 60 months."  Defs.' Mem. 9.  While there is admittedly some ambiguity in the SPD regarding whether the January 2000 date refers to the disability onset date or the date on which the participant goes on disability leave, the Defendants note that the Plan itself is clear that the relevant date is the date the participant went on leave.  Defs.' Mem. 17 (citing Admin. R. NG000206 (applying the sixty-month cap to participants who went on an "absence from work beginning on or after January 1, 2000 as a result of disability")).  Because the Plan itself is clear, they say, it controls.  See Defs.' Mem. 17; see also CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1877 (2011) (stating that the Supreme Court "cannot agree that the terms of statutorily required plan summaries . . . necessarily may be enforced . . . as the terms of the plan itself").

Again, the Court rules the Defendants' way on this issue. Given that the line immediately following the one upon which Vendura relies addresses the sixty-month cap, the only possible way Vendura could claim that the SPD entitles him to twenty years of Benefit Service is by arguing ambiguity.  But the Defendants are right to note that even if the SPD is ambiguous, the Plan itself is not, and the Plan controls.  Accordingly, the SPD cannot alter the Court's construction of the Plan above.

### c.    Other Communications & Equitable Estoppel

Finally, Vendura argues that the 2008 communications from the Northrop human resources representative ought estop the Defendants from now claiming that he is entitled to only twelve years of Benefit Service (seven for his active service plus five accrued during his disability leave).  <u>See</u> Pl.'s Mem. 18-19.  In that letter, the human resources representative told Vendura that "our legal counsel has confirmed that you do not have to retire by October 1, 2008.  You will remain [an] active employee on long term disability . . . due to your settlement agreement dated 7/11/2003."  Admin. R. NG000441.  Vendura claims that this statement, which he characterizes as a legal representation, "make[s] clear that [he] was intended to be treated as an employee for all purposes under the plan – including accrual of benefit service – until he retired."  Pl.'s Mem. 18.  He also points to First Circuit authority that he claims holds that

extrinsic statements may estop a plan administrator when it relates to an ambiguous plan term; because the Plan here does not explicitly provide for the limiting of his Benefit Service to twelve years, he says, the Defendants ought be estopped. Id. at 19 (citing Guerra-Delgado v. Popular, Inc., 774 F.3d 776, 782-83 (1st Cir. 2014)); see also Pl.'s Opp'n 16 (claiming that the 2008 statement meant that the Settlement Agreement's promise of continued employee status trumped the provision of the 2006 version of the Plan capping Benefit Service for disability leave at sixty months).

The Defendants offer two primary reasons why the 2008 communication ought not equitably estop them from arguing their present position.  Looking to the First Circuit precedent cited by Vendura, they note that equitable estoppel claims have two elements: "(1) the first party must make a definite misrepresentation of fact with reason to believe the second party will rely on it, and (2) the second party must reasonably rely on that representation to its detriment." Guerra-Delgado, 774 F.3d at 782 (internal quotation marks and citations omitted).  The Defendants argue that Vendura meets neither of these requirements.  First, they note that the Settlement Agreement and the 2008 communication contained no misrepresentations of fact: both deal exclusively with Vendura's employment status without making any statements whatsoever

regarding his pension or accrual of Benefit Service.  Defs.'
Mem. 18; Defs.' Opp'n 15.  Second, even if these documents
contain misrepresentations, Vendura has offered no evidence of
any reasonable detrimental reliance on those misrepresentations.
Defs.' Opp'n 15.

The Court rules for the Defendants on this point.  They are
correct that neither the Settlement Agreement nor the 2008
communication makes any misrepresentation of fact.  As discussed
above, the Settlement Agreement does not have any bearing on
Benefit Service accrual under the Plan, and the 2008
communication merely repeats the guarantee of continued
employment status without addressing Benefit Service in any way.
There is a possible argument that Vendura could have interpreted
the 2008 communication to imply that he was accruing Benefit
Service, given that the letters he sent the human resources
representative beforehand asked about this accrual, see Admin.
R. NG000438-43, but there are three reasons to reject this
approach.  First, any misstatements of fact must be "definite,"
Guerra-Delgado, 774 F.3d at 782, which the Court declines to
extend to this mere possibility of misrepresentation by
implication.  Second, even if there were a misrepresentation,
the Defendants are correct that Vendura in no way relied on it
to his detriment – indeed, it is impossible that reliance on it
could have changed his fortunes in any way, as the terms of the

[31]

Plan show he had stopped accumulating service three years before
the communications in question.   Third, the First Circuit has
held that equitable estoppel in the ERISA context only extends
to interpretations of a plan rather than any attempts to modify
its terms.   Guerra-Delgado, 774 F.3d at 782.   Because any
possible misrepresentation hidden in the 2008 communication
would serve to modify the terms of the Plan (specifically, by
eliminating the sixty-month cap on Benefit Service accrual
during disability leave), equitable estoppel cannot apply here.

Considering all of these arguments regarding the terms of
the Plan and evidence outside the Plan, the Court rules for the
Defendants and finds that Vendura is entitled to twelve years of
Benefit Service (seven for his active employment plus five
accrued during his disability leave) rather than the twenty
years of credit he seeks.

### C.   Lump Sum Distribution

An ancillary dispute in this case involves Vendura's
eligibility to elect a lump sum distribution of his pension.
The parties do not dispute the relevant term of the Plan, which
states that a Participant may elect the lump sum if (among other
things) he is still accruing Benefit Service.   See Pl.'s Mem. 7;
Defs.' Mem. 19.   The only dispute on this issue, then, is
whether Vendura was able to elect the lump sum when he began his
retirement process in 2013.   Vendura claims that he was eligible

to make this election because he was still accruing Benefit
Service at that time; the Defendants, in contrast, claim that he
was ineligible because he had stopped accruing Benefit Service
in 2005.  See Pl.'s Mem. 7; Defs.' Mem. 19.  Given the Court's
holding above that Vendura stopped accruing Benefit Service in
2005, the Court here rules that Vendura may no longer elect to
receive his pension as a lump sum.

One other issue pertaining to the lump sum question merits
discussion.  Vendura notes that in August 2000, shortly after he
first went on disability leave, he received a letter from
Northrop stating that he was "eligible for . . . a lump sum
payment as of March 1, 2013."  Admin. R. NG000446.  He contends
that this statement means that the Defendants thought he would
still be accruing Benefit Service into 2013, linking this with
his equitable estoppel claim regarding his Benefit Service.
Pl.'s Mem. 17 n.14; Pl.'s Opp'n 16.  This argument, however,
rests on a clear misreading of the letter.  The letter did not
say that he was able to elect a lump sum payment at any point
through 2013; it merely stated that at that time in 2000 – when
he was indisputably still accruing Benefit Service – he was
eligible to elect a lump sum that would be paid in 2013.  The
letter has no bearing on Vendura's accrual of Benefit Service or
ability to seek a lump sum payment.  Accordingly, it does not
affect the Court's rulings on either of these points.

[33]

### D.   Proper Defendants

The Defendants also argue that the only proper defendants to a 29 U.S.C. § 1132(a)(1)(B) claim such as this are the Plan and the Committee, meaning that the Court ought dismiss Northrop, its corporate subsidiaries, and the individually named defendants.  Defs.' Mem. 20 (citing Terry v. Bayer Corp., 145 F.3d 28, 36 (1st Cir. 1998) ("[T]he proper party defendant in an action concerning ERISA benefits is the party that controls administration of the plan." (internal quotation marks and alterations omitted)).  Given that the Court has already ruled in favor of the Defendants on the merits, it is largely unnecessary to evaluate this issue – after all, it now makes no functional difference (particularly at this late stage of the litigation) whether some of the Defendants were not proper parties.  In the interest of fully airing out the arguments, however, this opinion offers some thoughts on the matter.

Vendura properly points out that the Defendants overstate the holding of the First Circuit case underlying their argument. Pl.'s Opp'n 18.  While the Defendants cite the case for the proposition that only the Plan and the body administering the Plan are proper parties, that case arose out of a plaintiff's attempt to sue a third party that provided administrative assistance for his employer's pension plan.  Terry, 145 F.3d at 35.  In holding that ERISA did not permit the plaintiff to sue

this third party, the First Circuit noted that "[w]ith narrow

exception, . . . ERISA does not authorize actions against

nonfiduciaries of an ERISA plan." Id. (quoting Santana v.

Deluxe Corp., 920 F. Supp. 249, 253 (D. Mass. 1996) (Freedman,

J.)) (internal quotation marks omitted).

Applying these statements to the facts at hand, four of the

named defendants - Denise Peppard, Tiffany McConnell, Michael

Hardesty, and Ken Bedingfield – are the present members of the

Committee.  Admin. R. NG000382.  The 2009 version of the Plan,

in turn, states that "the Administrative Committee and each of

its members are 'named fiduciaries' of the Plan under ERISA for

all purposes other than investment matters."  2009 Plan 76.

Given that the cited First Circuit precedent grounds the

language on which the Defendants rely in the fact that the

defendant at issue there was not a fiduciary of the plan, it

appears that these four individuals are properly included in

this case.

The fifth individually named defendant, Jonathan Boxer,

presents a murkier question.  Vendura alleged in his complaint

that Boxer is "a senior legal counsel with one or more of the

Defendants who made discretionary decisions related to Plan

determinations at issue in this litigation, and therefore is a

fiduciary for purposes of the Plan."  Compl. ¶ 9.  The record

does not appear to contain any evidence of the role Boxer plays

or played in the administration of the Plan, suggesting that Boxer may not be a proper defendant.  Given that the Court's ruling on the merits renders this question largely academic, however, it declines to make a holding on this point.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motion for judgment, ECF No. 49, and DENIES Vendura's motion for judgment, ECF No. 46.

**SO ORDERED.**

/s/ William G. Young____
WILLIAM G. YOUNG
DISTRICT JUDGE